**AMISTAD, INC., Appellant,**

v.

**FRATES COMMUNITIES, INC., Appellee.**

**No. 6184.**

Court of Civil Appeals of Texas, Waco.

Nov. 20, 1980.

Rehearing Denied Jan. 8, 1981.

John R. Foster, John C. Hampton, Lowrey, Foster & Hodge, Del Rio, for appellant.

Sol E. Arledge, Arturo C. Gonzalez, Del Rio, for appellee.

## OPINION

JAMES, Justice.

This dispute arises out of a real estate transaction wherein the grantor, Defendant-Appellant Amistad, Inc., agreed to release parcels of land proportional to the amount of debt paid in installments by the grantee, Plaintiff-Appellee Frates Communities, Inc. Plaintiff-Appellee Frates brought this suit seeking, inter alia, rescission of the entire transaction, alleging that Amistad had breached its agreement to execute partial releases. Defendant-Appellant Amistad counterclaimed, alleging that Frates had defaulted on the notes given in payment for the land and that Amistad was therefore entitled to possession of the land pursuant to a fee simple determinable provision in the deed to Frates, or alternatively that Amistad was entitled to foreclosure of its liens against the land. Trial was had to a jury, after which the trial court rendered judgment denying Amistad's claims, granting the rescission sought by Frates, and awarding Frates a money judgment against Amistad for $982,389.20, said amount being the difference between the consideration paid by Frates and the rental value of the land for the period of time that Frates was in possession of the land. We reverse this judgment and remand the cause to the trial court for retrial.

On November 27, 1973, Frates entered into a contract with Amistad to purchase 8,671 acres of land located in Val Verde County, Texas, at a total purchase price of $2,384,525.00, $450,000.00 of which was to be paid in cash at closing, and the remainder to be paid by Frates executing a Vendor's Lien Note in the principal amount of the unpaid balance, bearing interest at 8% per annum and payable in twenty semi-annual installments due on April 1 and October 1 of each succeeding year, commencing on April 1, 1974. The sale was closed on May 9, 1974. At closing Frates made a cash down payment, executed a Vendor's Lien Note in the principal amount of $1,258,-764.64 for the remainder of the purchase price (after adjustments made at closing), executed a Deed of Trust securing the note, made the first installment payment on the note (which under the terms of the note had been due on April 1, 1974), and took possession of the property. The Deed of Trust executed to secure the Vendor's Lien Note contained an agreement for partial releases, which, in its pertinent parts, provided that:

"The Beneficiary and the Trustee each hereby irrevocably agree with the Grantor that they will at any time and from time to time execute and deliver to the Grantor partial releases of the lien of this deed of trust and the vendor's lien retained by the deed of even date from beneficiary to Grantor, or the entire lien of this deed of trust and the vendor's lien, as the case may be, upon the following conditions:

"1. All plats, surveys, releases and other documents necessary to effect releases shall be prepared at the expense of the Grantor. *Releases shall begin along and parallel to the northern boundary line of the property described in the Deed of Trust ... and run the entire width of the property from Highway 277 on the east to west boundary line.* (Emphasis supplied). Each release shall be 10 acres or more. Each subsequent release shall adjoin acreage previously released and must permit access to all unreleased tracts. In addition no release shall cause any unreleased tract to be separated from the main body of land remaining unreleased.

"2. The release price shall be $343.75 per are and any partial acre released shall be prorated at the same rate.... "... Each time the Grantor requests a partial release of the lien, the Grantor shall submit to the Beneficiary a survey plat and metes and bounds description of the parcel of land from which said release is requested, together with a form of partial release of said lien which shall contain language to the effect that the giving of such partial release shall not affect or impair the lien with respect to the property not being released."

In return Amistad delivered to Frates a deed conveying title to the property, but the deed contained the following "reversionary clause":

"Except as provided below for payments in accordance with the promissory note from Grantee to Grantor herein, this conveyance shall remain in force and effect so long as the terms and conditions of said promissory note and deed of trust and vendor's liens securing the same have not remained in default for a period of fifteen (15) days after receipt of written notice, by certified or registered mail, return receipt requested, from the holder of said note specifying the nature of said default and the steps necessary to cure such default, and if not corrected within the time provided above, then this conveyance shall terminate as to that portion of the land which has not been released from the lien securing its payment and title to that portion of such land shall, ipso facto, revert to and revest in Grantor, its successors or assigns. In the event that Grantee, his successors or assigns, fails or refuses to pay any installment by the due date therefor as established in the promissory note from Grantee to Grantor herein, or Grantee fails or refuses to pay any installment within ten days after date of notice by Grantor to Grantee, whichever occurs last, then this conveyance shall terminate as to that portion of land which has not been released

from the liens securing its payment and title to that portion of such land shall, ipso facto, revert to and revest in Grantor, its successors or assigns, provided that, not more than thirty (30) days prior to the due date of any such installment, Grantor has given written notice to Grantee, by certified or registered mail, return receipt requested, that such installment was coming due."

Frates timely made payments on the note in October 1974, April 1975, and October 1975, but no releases were requested during this time. On March 17, 1976 Frates made its first written request for a partial release from Amistad. The request was not received by Hal Rachal, President of Amistad, until March 22, 1976. On March 26, Max Naegler, Vice-President and General Counsel of Frates, delivered to Mr. Rachal the abstract to the land in question and inquired about the execution of the release. Mr. Rachal responded that he "would have to consider the matter further before telling (Naegler) whether (he) would execute a release." By letter dated March 29, Mr. Naegler informed Mr. Rachal that if Amistad had not executed the requested release and informed Frates of such execution by noon on March 31, that Frates would file suit for specific performance and would not make the April 1, 1976 payment on the Vendor's Lien Note until the matter had been resolved. The release was not executed.

On April 1, 1976, Frates did in fact fail to make the installment payment due on the note and no further payment has to date been tendered by Frates to Amistad. On the same date Frates filed suit for specific performance demanding execution of the requested release and also for an injunction prohibiting Amistad from foreclosing its deed of trust or vendor's lien or from taking action to enforce the reversionary provision of the deed conveying the property to Frates. Amistad responded with a general denial and a counterclaim seeking to foreclose its liens or to enforce the reversionary provisions of the deed. In November of 1978 Frates amended its petition to include alternative pleas for specific performance, damages, or rescission of the entire transaction because of Amistad's refusal to sign its requested partial release.

Trial was to a jury which, in response to the two issues submitted, both over appellant's objections, found that: (1) "Amistad, Inc., acting through its agent, Hal Rachal, under the attending circumstances, acted unreasonably in failing to advise the Plaintiff Frates Communities, Inc. or its agent, Max Naegler, prior to April 1, 1976, whether the Defendant (Amistad) would either accept or reject the partial release of lien dated March 15, 1976, tendered by the Plaintiff to Defendant for execution" and (2) "the Plaintiff, Frates Communities, Inc., acted reasonably under the attending circumstances in not making payment to the Defendant, Amistad, Inc., of those monies due on April 1, 1976". Upon this verdict the trial court entered judgment denying the relief sought by Amistad and rendered judgment granting rescission of the entire transaction and ordering restitution to Frates of all monies paid by it to Amistad for the purchase of the property in question.

Appellant Amistad appeals on thirteen points of error; however, we believe it necessary to discuss only two of such points, namely points one and eight as being determinative.

The deed of trust hereinabove quoted from contained provisions concerning the execution by Amistad to Frates of partial releases, and among such provisions was the following language, the meaning of which is disputed by the parties, to wit:

"Releases shall begin along and parallel to the northern boundary line of the property described in the Deed of Trust___and run the entire width of the property from Highway 277 on the east to west boundary line."

It was and is Amistad's contention by pleading and proof that, under these terms, proper partial releases were to be made in strips off the north end of the property running the entire width of the property from Highway 277 (or the east boundary) to

the west boundary, with the southern boundary of such released tract to be everywhere parallel to the northern boundary of the property. To the contrary, Frates contended that under the above-quoted language, the southern boundary of the released portion did not have to be "everywhere" parallel to the northern boundary, but had only "to *begin* along and parallel to the northern boundary . . ."; and it alleged

that the release it tendered to plaintiff was "under the terms and conditions agreed to."

The map below, though not drawn to scale, depicts the respective contentions of the parties. The configuration of the release as requested by Frates is shown by the solid outline; the configuration advocated as proper by Amistad is shown by the dashed outline:

Amistad stoutly contends that the partial release proposed by Frates would give Frates clear title to virtually all of the waterfront property which was the most valuable of all the property, leaving Amistad with a lien on only land of much less value per acre than that to be released. Moreover, Frates was not individually or personally liable on the note, which meant that the only security Amistad had for same was the land itself.

According to the language of the instruments concerned as we understand it, and the principal payments made by Frates, the released tract of land would consist of 714.-23 acres, based upon the agreed rate of

$343.75 per acre. The crux of this lawsuit is whether this 714.23 acre tract as described in the partial release as submitted to Amistad by Frates is a proper one under the terms of the disputed language hereinabove quoted.

Appellant Amistad's first point of error asserts the trial court erred in refusing to submit the following requested special issue submitted by Amistad:

"Do you find from a preponderance of the evidence that the 'South line' as described in the requested partial release submitted to Defendant (Amistad) by Plaintiff (Frates) begins along and parallel to the

north boundary line of the Stewart ranch beginning at a point on Highway 277 on the East and continuing to the West boundary line of said ranch?

"Answer: 'we do' or 'we do not'."

It will be seen that the foregoing special issue submitted by Amistad is couched in the language of the disputed wording of the deed of trust. Amistad contends, and we agree, that the central issue in this case is whether or not Amistad breached its agreement by failing to execute this partial release.

We are bearing in mind that Frates, as Plaintiff, had the burden in the trial court to establish that its proposed partial release complied with the disputed language of the deed of trust as hereinabove quoted. Nonetheless, Amistad's requested special issue hereinabove quoted would have squarely put in issue before the jury the question as to whether the partial release proposed by Frates was a proper one under the terms of the deed of trust. We believe that, under the record before us, the court's refusal to submit this requested special issue to the jury was error. If the partial release proposed by Frates was proper under the deed of trust provisions, then Amistad had a duty to execute it; on the other hand, if said proposed partial release was improper under and in violation of the deed of trust, then Amistad of course had no duty of any kind to execute it. If Amistad had no duty to execute the release, there could be no breach of contract by Amistad, and Frates's nonpayment of the April 1, 1976, installment on the note would clearly constitute a breach or default on its part, thereby triggering the fee simple determinable provisions in the deed, as well as the foreclosure of the vendor's and deed of trust liens.

Appellant's point number 8 asserts error of the trial court in submitting to the jury the two special issues that were submitted to the jury, contending that both special issues are irrelevant and cannot support the judgment. We sustain this contention also.

The trial court submitted only two special issues to the jury as follows:

"Special Issue No. 1

"Do you find from a preponderance of the evidence that the Defendant Amistad, Inc., acting through its agent, Hal Rachal, under the attending circumstances, acted unreasonably in failing to advise the Plaintiff, Frates Communities, Inc., or its agent, Max Naegler, prior to April 1, 1976, whether Defendant would either accept or reject the Partial Release of Lien dated March 15, 1976, tendered by Plaintiff to Defendant for execution?" To this issue the jury answered, "It did act unreasonably."

"Special Issue No. 2

"Do you find from a preponderance of the evidence that the Plaintiff, Frates Communities, Inc., acted reasonably under the attending circumstances in not making payment to Defendant, Amistad, Inc., of those monies due on April 1, 1976." To this issue the jury answered, "It did act reasonably."

Neither of these issues is a controlling issue in this case. As stated before, Amistad either had a legal duty to execute the partial release tendered by Frates or it did not, depending upon whether the tendered partial release complied with the terms of the deed of trust or not. Therefore, whether Amistad acted reasonably or unreasonably in failing to advise Frates as to whether it would accept or reject the tendered partial release is immaterial.

Likewise, concerning Special Issue No. 2, Frates owed a note to Amistad which called for a payment of $92,622.11 due April 1, 1976. Frates either had a legal duty to make this payment or it did not, and whether it acted reasonably in not making this payment is beside the point.

In summary, the jury's answers to these two special issues form no basis for and will not support the trial court's judgment. We therefore reverse the trial court's judgment and remand the entire cause for retrial on its merits.

In view of the fact that the case is to be retried, we deem it pertinent to say

that in our opinion the above-quoted language of the deed of trust which brought about this lawsuit is ambiguous, and we have been unable to apply any rules of legal construction to resolve the ambiguity. We believe the language standing alone is reasonably susceptible to either the construction put upon it by Amistad, or that put upon it by Frates. In such a situation it would be proper for parol evidence to be admitted to remove the ambiguity of the words used in the deed of trust, to show the true intention of the parties. If parol evidence as to the true intention of the parties is admitted, and such evidence is conflicting (as it surely would be in the case at bar), then such intention presents a fact issue to be presented for jury determination.

 Where an unambiguous writing has been entered into between the parties, courts will look only to the language of the agreement to determine the intent of the parties. *City of Pinehurst v. Spooner Addition Water Co.* (Tex.1968) 432 S.W.2d 515. But whenever a written instrument is reasonably susceptible to more than one meaning, it is an ambiguous instrument, and parol evidence should be admitted to determine the intention of the parties. *Trinity Universal Ins. Co. v. Ponsford Bros.* (Tex. 1968) 423 S.W.2d 571. Moreover, if there is any ambiguity in the meaning of a written instrument, and any dispute as to the interpretation thereof as placed upon it by parties, the issue as to its true meaning is one of fact for the jury. *Ellisor v. Kennedy* (Galveston Tex.Civ.App., 1939) 128 S.W.2d 842, writ refused.

REVERSED AND REMANDED.